**NILES–BEMENT–POND CO. v. FITZ-
PATRICK, Collector of Internal
Revenue.**

Civ. 3988.

United States District Court
D. Connecticut.

April 28, 1953.

Benjamin Hinman, Shipman & Goodwin, Hartford, Conn., for plaintiff.

Adrian W. Maher, U. S. Atty., and Edward J. Lonergan, Asst. U. S. Atty., Hartford, Conn., David A. Wilson, Jr., Special Asst. to the Atty. Gen., Washington, D. C., for defendant.

SMITH, District Judge.

This action seeks to recover $3,437.50 stamp taxes imposed and paid under Section 1801 Internal Revenue Code, 26 U.S. C.A. § 1801.

#### Finding of Facts.

1. Taxpayer, Niles-Bement-Pond, is now and at all times hereafter mentioned was a corporation organized and existing under the laws of the State of New Jersey and having its principal place of business in the Town of West Hartford, Connecticut.

2. The defendant, John J. Fitzpatrick, was at all times material hereto, Collector of Internal Revenue for the District of Connecticut.

3. Plaintiff executed and issued twenty-nine instruments dated September 15, 1949 evidencing the borrowing of $3,125,000 by

plaintiff from the National City Bank of New York.

4. The maturity dates, principal amounts and interest rates of the instruments were as follows:

| Column 1 Maturity Date | Column 2 Principal Amount | Column 3 Interest Rate |
|---|---|---|
| 10/1/49 | $ 125,000.00 | 2% |
| 1/1/50 | 125,000.00 | 2% |
| 4/1/50 | 125,000.00 | 2% |
| 7/1/50 | 125,000.00 | 2% |
| 10/1/50 | 125,000.00 | 2% |
| 1/1/51 | 125,000.00 | 2% |
| 4/1/51 | 125,000.00 | 2% |
| 7/1/51 | 125,000.00 | 2% |
| 10/1/51 | 125,000.00 | 2% |
| 1/1/52 | 100,000.00 | 2½% |
| 4/1/52 | 100,000.00 | 2½% |
| 7/1/52 | 100,000.00 | 2½% |
| 10/1/52 | 100,000.00 | 2½% |
| 1/1/53 | 100,000.00 | 2½% |
| 4/1/53 | 100,000.00 | 2½% |
| 7/1/53 | 100,000.00 | 2½% |
| 10/1/53 | 100,000.00 | 2½% |
| 1/1/54 | 100,000.00 | 2½% |
| 4/1/54 | 100,000.00 | 2½% |
| 7/1/54 | 100,000.00 | 2¾% |
| 10/1/54 | 100,000.00 | 2¾% |
| 1/1/55 | 100,000.00 | 2¾% |
| 4/1/55 | 100,000.00 | 2¾% |
| 7/1/55 | 100,000.00 | 2¾% |
| 10/1/55 | 100,000.00 | 2¾% |
| 1/1/56 | 100,000.00 | 2¾% |
| 4/1/56 | 100,000.00 | 2¾% |
| 7/1/56 | 100,000.00 | 2¾% |
| 10/1/56 | 100,000.00 | 2¾% |

$3,125,000.00

5. The plaintiff, a large machine tool manufacturer, had expanded greatly by reason of defense contracts during World War II. Following the close of hostilities, its business fell off sharply. In 1949, however, a pick up in business was expected, and the plaintiff determined to increase its cash and working capital and to refinance its existing loans for this purpose for longer terms than its then existing borrowings.

6. National City Bank had been plaintiff's depository and supplier of short term credit when needed for some 20 years.

7. National City agreed to loan plaintiff $3,125,000 to be repaid in quarterly instalments over a period of seven years, the first nine instalments of $125,000 each, the remaining instalments of $100,000 each.

8. The loan agreement permitted repayment in advance of maturity, except that repayment from borrowings elsewhere than from National City required payment of ¼% premium.

9. The loan agreement bound the plaintiff to the maintenance of certain working capital, to keep its properties insured and free from tax or other liens, to refrain from incurring any new indebtedness for borrowed money either through the issuance of securities or otherwise except indebtedness maturing within one year in an amount not exceeding $2,000,000, and to refrain from purchase of its own stock, merger or consolidation or sale of fixed assets except on payments on the Serial Notes to be issued to the National City to evidence the indebtedness under the agreement.

10. The notes were on plain white watermarked bond paper, in the following terms [amount, date of maturity and interest rate varying as stated above]:

"Promissory Note

West Hartford, Conn.
September 15, 1949

"$100,000

"On the 1st day of July, 1952, for value received, the undersigned, Niles-Bement-Pond Company, a New Jersey corporation [hereinafter called the "Company"] hereby promises to pay to the order of The National City Bank of New York the principal sum of the One Hundred Thousand Dollars [$100,-000] in lawful money of the United States, with interest thereon from the date hereof until maturity at the rate of two and one-half per cent [2½%] per annum, payable quarter-annually on the first day of each of the months of January, April, July and October, of each year, both principal and inter-

est to be payable at the office and principal place of business of said Bank, No. 55 Wall Street, New York City, N. Y.

"This promissory note is one of the Serial Notes referred to in a certain letter agreement between the Company and said Bank, dated the 22nd day of August, 1949, and is subject to the provisions and entitled to the benefits thereof. Upon the occurrence of an event of default specified in said agreement all amounts owing hereon may become or may be declared to be forthwith due and payable, in the manner, upon the conditions, and with the effect provided in said agreement.

"Niles-Bement-Pond Company
By *F. U. Conard*
President"

11. The plaintiff was required to maintain a deposit balance of approximately 20% of the amount of its debt.

12. After receiving the proceeds of the loan, the plaintiff's cash position showed an increase of about 1¼ million, its working capital an increase of about 2¼ million.

13. At the time, the loan was used for taxes, payroll, inventory, tooling, machinery, equipment and like purposes. There was then no expectation of need in the near future for increased plant capacity. The outbreak of the Korean War in the following year, however, led to a substantial increase in capacity.

14. Prior to the outbreak of World War II, National City's loan department made loans to its industrial depositors such as plaintiff only on short term notes, typically with 30, 60 or 90 day maturities, although sometimes running as long as 6 months.

15. During World War II, however, with the expansion of its customers' need for working capital over an extended period, the device used in the instant case was developed, of loans for working capital on an instalment basis with maturities running to seven years as in this case or in some instances to as long as ten years, protected by an agreement restricting to some extent the borrower's freedom of action in fiscal matters, and providing for periodic financial reports to the bank.

16. Most of the loan department's activity, however, continues to be in the traditional short term loans on ordinary 30, 60 and 90 day paper at the current interest rate for prime paper, in practice often renewed on maturity.

17. In the relatively new type of working capital financing, the interest rate varies, being higher the longer the term of the loan.

18. It has the advantage to the borrower of assurance of longer maturities, the advantage to the bank of higher interest rates. The bank loses its power to call the loans at a near date, but protects itself to some extent by the contract of the borrower to follow good business practices as defined in the loan agreement.

19. The bank expects the payment of the loan to come from the liquidation of inventories in the normal business of the borrower.

20. Capital account financing is still expected by the bank to be carried out through the floating of investment securities, traditional bonds or debentures, which are handled through the investment department of the bank.

### Conclusions of Law

1. The Court has jurisdiction of the parties and subject matter of the action.

2. Plaintiff's 29 instruments dated September 15, 1949 to the National City Bank of New York are debentures within the meaning of Section 1801 Internal Revenue Code, 26 U.S.C.A. § 1801.

3. Stamp taxes were legally assessed and paid upon plaintiff's 29 instruments.

4. Defendant is entitled to judgment dismissing the action.

### Discussion

A corporate debenture by some definitions might include any corporate promissory note. Since the provision taxing the issue of notes was repealed, however, the Congress obviously intended to separate some evidences of indebtedness from the general class of corporate promises to pay, and relieve them of the tax.

Our task is to determine where the Congress intended these corporate obligations

to fall, with notes or in the remainder of the larger classification of debentures.

They are entitled "promissory notes". They are on plain white paper and in appearance bear out the testimony that the parties normally do not expect to renegotiate them to the public.

They do, however, refer on the face of the notes to the default provisions of the covering letter agreement between the borrower and the bank.

Why did the Congress make the distinction it did in repealing the taxation of notes?

It is argued that it intended to tax only traditional "investment" paper, designed for wide distribution, and not that used in financing the working inventories of business, designed for the commercial banking creditor only.

It can hardly have been intended that the form or color of the paper should have a tax significance. Nor does it appear that the "investment" feature, with wide distribution is a likely classification intended.

I am inclined to think that one of the things the Congress intended to avoid by the repeal was the multiplication of the burden on that portion of corporate and individual financing requiring short term credit, of repeating the payment of tax upon each 30, 60 or 90 day refinancing.

In the device which is used here, the parties have eliminated this recurrent burden when they found a substitute protection to the lender in place of the short term. The substitute protection is perhaps not as weighty as that of mortgage bonds or debentures carrying sinking found and trust provisions. It is however thought sufficient to eliminate the necessity for the traditional very short term for some part of the corporate working capital financing. It narrows the field in which the only recourse is to the short term loan. It does not however, eliminate it entirely, for short term loans of up to $2,000,000 at any time in addition to the loan in question are contemplated by the agreement, and some short term financing on the old basis continues to be supplied to the plaintiff by National City.

Perhaps the legislative history of the repeal statute will be helpful.

To understand the causes which resulted in the repeal of the stamp tax on promissory notes, one must take note of the then-current political situation. The Republican administration had proposed a tax plan [the Mellon plan] which included a flat 25% cut on all surtaxes for individual incomes. In addition, the administration bill proposed that a large number of excise taxes be repealed. The bill had met a good deal of resistance, however, even from Republicans. Consequently, Congressman Garner, a ranking Democrat on the House Ways and Means Committee, was able to wield more influence, than a minority member would ordinarily be able to command.

The House Ways and Means Committee had reported out a revenue bill which contained no repeal of the stamp tax on notes. Report No. 179, 68th Cong. 1st Sess., accompanying H.R. 6715. The following discussion occurred on the floor of the House. 65 Cong.Rec. 2437.

"Mr. Garner—You have left in the bill taxes on notes that one who borrows money has to give * * *. Now think of repealing the taxes on bowie knives and dirks and daggers and slingshots before you repeal the taxes of the poor man who gives a note in his distress to borrow money to supply the necessities of life for self and family [Applause]

"Mr. Ward—Will the gentleman yield?

"Mr. Garner—Yes.

"Mr. Ward—The Committee report advocates the repeal of the tax on yachts.

"Mr. Garner—Yes, they have them in New York. [Laughter]

"Mr. Ward—It is no reflection on New York.

"Mr. Garner—No, I congratulate the gentleman from New York on having lots of yachts. I am against all these war taxes, but when you have got to select some and leave others I object to your taking the tax off yachts and

leaving it on the poor fellow's note. Is it possible that when there is a choice between the two you want to remit taxes to the fellow who has a yacht and not to the poor fellow who has made a note?

"Mr. Deal—Will the gentleman yield?

"Mr. Garner—Yes.

"Mr. Deal—Will the gentleman, when the time comes, use his efforts to correct these inconsistencies? I will try to help the gentleman.

"Mr. Garner—I will do that."

Mr. Garner, in fact, offered his own tax plan in opposition to the Committee plan. Neither plan passed; a third plan [the Longworth Compromise] passed the House and was referred to the Senate Finance Committee. 65 Cong. Rec. 3354. This plan contained a repeal of the stamp-tax on promissory notes.

The Senate Finance Committee re-inserted the note-tax, recommending in its report "that the tax imposed by the present law on drafts or checks payable otherwise than at sight or on demand and upon promissory notes be restored". Rept. of Comm. on Finance, p. 10, Rept. No. 398, 68th Cong. 1st Sess., to accompany H.R. 6715.

The Conference Committee, however, agreed to go along with the House's version on this point, and the stamp-tax on promissory notes was repealed. Conference Report on H.R. 6715, Rept. No. 844, 68th Cong., 1st Sess.

Thus, Congressional intent seems to have been to relieve the poor *individual* from a burden; it is most probable that the effect of the repeal on corporation paper was given little or no consideration.

Of course, no distinction was made in the repeal between individual and corporate borrowers, but the history may be of some assistance in determining the content of the tax on debentures remaining in effect.

There is a difference in approach to the problem in the different circuits. Compare G. M. A. C. v. Higgins, 2 Cir., 161 F.2d 593 and Commercial Credit Co. v. Hofferbert, D.C.Md., 93 F.Supp. 562, affirmed 4 Cir., 188 F.2d 574 with U. S. v. Ely & Walker Dry Goods Co., 8 Cir., 201 F.2d 584, Belden Mfg. Co. v. Jarecki, 7 Cir., 192 F.2d 211, Shamrock Oil & Gas Co. v. Campbell, D.C. N.D.Tex., 107 F.Supp. 764, Allen v. Atlanta Metallic Casket Co., 5 Cir., 197 F.2d 460, Leslie Salt Co. v. U. S., D.C.N.D.Cal., 110 F.Supp. 680.

In the case at bar there appear to be sufficient of the criteria stressed by the Second Circuit in the GMAC case to hold these instruments taxable as corporate debentures. The substantial period of time involved, the restrictions on the borrower's fiscal activities, together with the amounts involved requiring such restrictions, fit these instruments within the rationale of the Second Circuit's opinion as debentures in the meaning of the Act.

It may be that in drawing the line, other circuits would place these instruments with "notes". We must respectfully differ and classify them for the purpose of this Act as corporate debentures.

Judgment may be entered for the defendant, dismissing the action.