**NILES–BEMENT–POND CO.**

v.

**FITZPATRICK.**

No. 122, Docket 22881.

United States Court of Appeals,
Second Circuit.

Argued March 9, 1954.

Decided May 5, 1954.

Benjamin Hinman, Hartford, Conn. (Shipman & Goodwin, Hartford, Conn. of counsel), for plaintiff-appellant.

H. Brian Holland, Asst. Atty. Gen. (Ellis N. Slack, Fred E. Youngman, Special Assts. to Atty. Gen., Simon S. Cohen, U. S. Atty., Hartford, Conn., on the brief), for defendant-appellee.

Before CLARK, MEDINA and HARLAN, Circuit Judges.

HARLAN, Circuit Judge.

This appeal brings before us a question as to the applicability of the stamp tax sections of the Internal Revenue Code, 26 U.S.C. §§ 1800, 1801, to corporate "promissory notes" issued to a banking institution for a loan.

The District Court, after a trial, filed a memorandum decision containing Findings of Fact and Conclusions of Law, and, relying upon our decision in General Motors Acceptance Corp. v. Higgins, 2 Cir., 161 F.2d 593, certiorari denied 1947, 332 U.S. 810, 68 S.Ct. 112, 92 L.Ed. 888, held that the notes involved should be regarded as corporate de-

bentures and as such subject to stamp taxes under Sections 1800 and 1801.[1] Niles-Bement-Pond Co. v. Fitzpatrick, D.C.Conn. 1953, 112 F.Supp. 132.

In 1949, Niles-Bement-Pond Company, a manufacturer of machine tools whose principal place of business is at West Hartford, Conn., negotiated a $3,125,000 loan from the National City Bank of New York. The reasons for this loan were to increase the Company's cash and working capital, and to refinance its existing loans, made for like purposes, for longer terms.

The Company issued to the Bank twenty-nine "Promissory Notes," nine in face amount of $125,000 each and twenty each in face amount of $100,000. These notes matured at quarterly intervals over a period of seven years, beginning October 1, 1949 and ending October 1, 1956, with an initial interest rate of 2%, which was stepped up to 2½% beginning with the note maturing January 1, 1952, and to 2¾% beginning with the note maturing July 1, 1954. The notes, all in identical form except as to amounts, maturity dates and interest rates, were each captioned "Promissory Note" and were typewritten-mimeographed on plain white watermarked paper.

These notes were issued under a Loan Agreement pursuant to which Niles-Bement-Pond, among other things, obligated itself to (a) maintain a minimum amount of working capital, (b) keep its properties insured and free from tax and other liens, (c) refrain from incurring any new indebtedness for borrowed money, through the issuance of securities or otherwise, except indebtedness

---

[1] "§ 1800. Imposition of tax

"There shall be levied, collected, and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters, and things mentioned and described in sections 1801 to 1807, inclusive, or for or in respect of the vellum, parchment, or paper upon which such instruments, matters, or things, or any of them, are written or printed, the several taxes specified in such sections."

"§ 1801. Corporate securities

"On all bonds, debentures, or certificates of indebtedness issued by any corporation, and all instruments, however termed, issued by any corporation with interest coupons or in registered form, known generally as corporate securities, on each $100 of face value or fraction thereof, 11 cents: *Provided*, That every renewal of the foregoing shall be taxed as a new issue * * *."

not exceeding $2,000,000 and maturing within one year, (d) refrain from purchase of its own stock, merger or consolidation, or sale of fixed assets except upon ratable application of any proceeds to the payment of the notes issued to the National City Bank, and (e) submit periodic financial statements to the Bank.

The following additional facts are pertinent: the Loan Department of the National City Bank for many years in the regular course of its business has made loans to the Bank's industrial depositors to meet their temporary working capital requirements and for other purposes. Prior to World War II such loans were initially made on a short term basis, usually varying from 30, 60 or 90 days to six months, and then, if need be, renewed for such further periods as the exigencies of the borrower's business might require.

With the outbreak of World War II many industrial concerns became involved in furnishing supplies to the Government under contracts requiring for their fulfillment the borrowing of larger amounts of temporary working capital and for more extended periods of time. Industrial customers of the Bank engaged in such war work disliked to be faced with continuing maturities inherent in the former practice of 30 days to 6 months borrowings, and also wished to be relieved of the uncertainty as to whether such loans would be renewed or not. To obviate these objections the National City Bank in the early 1940's instituted the practice of making term loans of the type involved here.

Such loans, which are made only to depositors of the Bank, vary in amount from $10,000, in the case of small businesses, to amounts in excess of the present loan, in the case of larger enterprises. The Bank endeavors to keep the maturities as short as possible, and the longest maturity so far given has been ten years. The interest payable is determined by the current prime rate, with some graduated increase in the case of the longer term loans. The loans are protected by loan agreements restricting to a certain extent the borrower's fiscal activities; and the Bank looks to repayment of the loan from the liquidation of inventories in the normal course of business. The making of such loans is within the province of the Bank's Loan Department, just as are the more usual 30 days to six months loans, in contrast to capital account financing which is handled through the Investment Department of the Bank.

In order to put in focus the issue before us, some reference to the legislative history of stamp taxes on debentures and promissory notes is necessary. From 1898 to 1902 and from 1914 to date, "debentures" as such, among other types of corporate securities, have been subject to stamp taxes at varying rates; and from time to time "promissory notes" have also been subject to stamp taxes, but always in a different paragraph of the taxing Schedules than that fixing the rate of tax on debentures, and always at a lower rate.[2] In 1924 the stamp tax on both debentures and promissory notes was repealed, but the tax on debentures and other types of corporate securities, substantially as presently contained in 26 U.S.C. §§ 1800–1801, was re-enacted. Rev.Act of 1924,

2. Act of June 13, 1898, 30 Stat. 448, § 6, p. 451, Sch. A, pp. 458–9; Act of March 2, 1901, 31 Stat. 938 (repeal of tax on promissory notes); Act of April 12, 1902, 32 Stat. 96–97 (repeal of all documentary stamp taxes); Act of October 22, 1914, 38 Stat. 745, § 5, p. 753, Sch. A, pp. 759–60 (imposition of tax on bonds, debentures and promissory notes); Act of October 3, 1917, 40 Stat. 300, Tit. VIII, p. 319, Sch. A, Subds. 1, 6, pp. 321–3 (Revenue Act of 1917, carrying forward taxes on bonds, debentures and promissory notes); Act of February 24, 1919, 40 Stat. 1057, Tit. XI, p. 1133, Sch. A, Subds. 1, 6, pp. 1135, 1137 (Revenue Act of 1918 carrying forward same taxes); as amended by Act of November 23, 1921, 42 Stat. 227, Tit. XI, p. 301, Sch. A, Subds. 1, 5, pp. 303, 305 (Revenue Act of 1921, retaining tax on both debentures and promissory notes); Revenue Act of 1924, 43 Stat. 253, Tit. VIII (Stamp Taxes), p. 331, Sch. A, p. 333; I.R.C. §§ 1800, 1801.

43 Stat. 253, Tit. XI (Repeals), page 352; Tit. VIII (Stamp Taxes), page 331, Sch. A, page 333. The tax on promissory notes has not been re-enacted since the 1924 repeal.

It thus appears from this taxing history that Congress set apart at least some types of "promissory notes" for different tax treatment than debentures. And if it could be shown that these earlier statutes taxing "promissory notes" embraced the type of promissory note involved in the transaction before us, the final repeal of the "promissory note" tax in 1924 would put the appellant well along the road to a favorable decision in this case.

On the other hand, from a conclusion that the promissory notes here involved are not of the type previously subject to stamp taxes it by no means follows that these notes are nonetheless subject to the debenture tax simply because they are corporate loan instruments. That would depend upon whether the notes, though termed "promissory notes," are in substance debentures within the purview of Section 1801. See General Motors case, supra. The Treasury itself views the matter in the same light. Treasury Regulation 71, § 113.55, relating to Sections 1800 and 1801, provides that "an instrument, however designated, having *all the essential characteristics* of a * * * debenture * * * is taxable as such." (Italics supplied.)

We therefore pass to a consideration of these two aspects of the problem.

The District Court apparently reached the conclusion that the 1924 repealer was intended to reach only the short term promissory notes of individuals. "Thus, Congressional intent seems to have been to relieve the poor *individual* from a burden; it is most probable that the effect of the repeal on corporation paper was given little or no consideration." Niles-Bement-Pond Co. v. Fitzpatrick, supra, 112 F.Supp. at page 136. But at this point we may observe that the earlier statutes taxing promissory notes did not distinguish between individual and corporate promissory notes

nor between notes of different duration, and that the new Revenue Act of 1924 did not preserve stamp taxes on any kind of promissory notes. Nor have we been able to find any indication that Congress thought that the tax on corporate promissory notes as such was preserved by that Section of the 1924 Revenue Act which took over in *haec verba* the section of the earlier statute taxing debentures, among other corporate securities. Compare Act of June 2, 1924, 43 Stat. 253, Tit. VIII, Sch. A, Subd. 1, page 333, with Act of November 23, 1921, supra, at page 303, and Act of February 24, 1919, supra, at page 1135.

We may also note Judge Chase's statement in the General Motors case, supra, that the stamp tax on promissory notes which was repealed in 1924 "was taxation which covered the notes used customarily in day to day commercial transactions of a short term credit character and not instruments, whether called notes or something else, by which a corporation obtained capital for a substantial period of time from investors for general use in its business just as it might by the sale of its bonds, debentures or similar securities". 161 F.2d at page 595. Judge Chase went on to say: "The tax on debentures was not repealed and if debentures are issued and sold it is clear that they are none the less taxable because they are called promissory notes". 161 F.2d at page 595. To the same effect see: Belden Mfg. Co. v. Jarecki, 7 Cir., 1951, 192 F.2d 211; U. S. v. Ely & Walker Dry Goods Co., 8 Cir., 1953, 201 F.2d 584. After examining all of the circumstances surrounding the transaction involved in the General Motors case the Court concluded that various factors (to which we shall refer a little later) "combined to put them [the notes] in a class apart from ordinary commercial promissory notes and into the category of debentures * * *". 161 F.2d at page 596. The Court's decision that the GMAC promissory notes were subject to stamp taxes went on this ground, and not on the ground that only "short term" promissory notes were

comprehended in the 1924 repeal of stamp taxes on promissory notes, nor on the ground that the purpose of the loan was in itself the controlling thing.

We find nothing in the earlier statutes which establishes either that the former stamp taxes on promissory notes or their repeal was limited to individual or short term promissory notes. Nor is the legislative history of these statutes illuminating on this score. The District Court in the present case in reaching the conclusion that the purpose of the 1924 repealer was "to relieve the poor *individual*" from stamp taxes referred to some of the debate on the floor of Congress in connection with the 1924 Revenue Act. 112 F.Supp. at pages 135–136.

An examination of the debates and committee reports preceding the enactment of the 1898 Statute, 31 Cong.Rec. 4263–4460, 4850–5749 (55th Cong., 2d Sess.), and those surrounding the succeeding statutes up to 1924 which imposed a tax upon notes, reveals nothing as to the scope of the promissory note taxing provisions.[3] Prior to the 1924 Act, the only discussion of the matter which we have found is contained in the Report of the House Ways and Means Committee on H.R. 12394 (which became the Act of March 2, 1901). In estimating the revenue loss contemplated as a result of repealing the note tax, Mr. Payne, Chairman of the Committee, predicated his estimates upon an opinion of the Comptroller of the Currency that notes taken by national banks ran, on an average, for ninety days. 34 Cong.Rec. 245 at 246–7 (56th Cong., 2d Sess.). But this statement can hardly be said to indicate a Congressional view that the notes previously taxed were only those which did not exceed this average. Moreover, a later statement in the same report that the Committee had "left on

taxes in Schedule A which applied to transactions on stock exchanges in the large cities of the country, both in speculating in farm produce and also in buying and selling stocks and bonds on the market * * * " might be taken as an indication that Congress viewed bonds and debentures as essentially marketable investment instruments, as distinguished from commercial banking, promissory note transactions.

The debates relating to the 1924 repeal are also wholly inconclusive. While there are repeated references to the necessity for relieving "the old farmer who goes to the bank and renews his note every 90 days" from a recurring tax upon each renewal, and a reference to repealing the tax on "the misfortune of men," 65 Cong.Rec. 3277 (68th Cong., 1st Sess.), there is also a recognition that "a large part of the tax is paid by corporations who borrow money by millions in the banks of the large cities." 65 Cong. Rec. 3279 (68th Cong., 1st Sess.). Similarly, emphasis in the debates on the 30–60–90 day transaction is counterbalanced by a recognition that some loans may extend over a period of as much as five years. 65 Cong.Rec. 3280 (68th Cong., 1st Sess.). And references to small loans are offset by other references which might be interpreted as an intention to remove the tax from all commercial bank transactions. See 65 Cong. Rec. 8199 (68th Cong., 1st Sess.). And the Committee reports on the 1924 bill, which would be more persuasive on the issue of legislative intent, hardly mention the matter at all.

The most that can be said from this meagre legislative history as to the 1924 repeal is that perhaps some members of Congress were especially concerned with exempting notes for small amounts on a 90-day term basis, but even such indi-

3. For the legislative history of the 1914 Act, see H.R.Reports Nos. 1163, 1193 and 1200 and S.Report No. 813 on H.R. 18891 (63d Cong., 2d Sess.); for the 1917 Statute, see H.R.Report No. 1366 and S.Report No. 1039 on H.R. 20573 (64th Cong., 2d Sess.), and H.R.Reports Nos. 45 and 172 and S. Reports Nos. 75 and 103 on H.R. 4280 (65th Cong., 1st Sess.); for the Revenue Act of 1918, see H.R.Reports Nos. 767 and 1037, and S. Report No. 617 on H.R. 12863 (65th Cong., 2d and 3d Sess.); and for the Revenue Act of 1921, see H.R.Reports Nos. 350 and 486 and S.Report No. 275 on H.R. 8245 (67th Cong., 1st Sess.).

**310**

vidual expressions to that effect must be read in the context of a debate which had a highly political backdrop.

By the same token, we think that neither these early statutes themselves nor their legislative history supports an argument that since Congress in 1924 repealed without limitation the pre-existing stamp taxes on "promissory notes" such notes under no circumstances can now be subject to stamp taxes. While we do not understand that such an argument is pressed by the appellant at bar, it was made (and rejected) in General Motors Acceptance Corp. v. Higgins, supra, at page 595, and in Commercial Credit Co. v. Hofferbert, D.C.Md.1950, 93 F.Supp. 562, 564.

Therefore, as we view the matter, the turning point in this case is whether the Niles-Bement notes, though termed "promissory notes," nonetheless have rather the attributes of corporate debentures so as to make them subject to stamp taxes under Sections 1800 and 1801 of the present Revenue Laws. Since neither Congress nor the Bureau of Internal Revenue has ever defined the term "debentures" under the stamp tax statutes, and the legislative history throws no light on the subject, we proceed to examine these promissory notes, and the transaction to which they relate, to determine whether they fit more the category of a debenture issue than a straightforward commercial loan, as those terms are commonly understood in the business world.

■ 1. The notes here were typed on plain white paper and did not bear the corporate seal, in contrast to the GMAC notes which were printed on tinted paper with engraved borders, issued in serial form, and bore the corporate seal. These differences in appearance, while not of great weight, are at least of more significance in establishing the true genus of these instruments than the mere description "promissory notes" or "debentures." See: U. S. v. Ely & Walker Dry Goods Co. and Belden Mfg. Co. v. Jarecki, supra.

■ 2. The restrictions placed on the activities of Niles-Bement by the Loan Agreement perhaps to some extent point away from this loan being the usual sort of commercial loan transaction. But we do not think that fact, standing alone, is controlling. In a loan of this magnitude such restrictions are not surprising; and we find nothing in the statutes or legislative history establishing that the size of the transaction is determinative of its tax consequences. See Belden Mfg. Co. v. Jarecki, supra, 192 F.2d at page 214. For the same reason we discount appellant's emphasis on the fact that the GMAC loan was much larger than this one. GMAC was also much larger than Niles-Bement.

■ 3. In this case the term of the loan was 7 years; the GMAC loan was for 5 years. But more significant is the fact that in the GMAC loan the maturity dates of the notes were bunched within the 6 months period at the close of the term, whereas here the notes matured at regular quarter-annual intervals, so that 36% of the loan was repayable during the first two years. This indicates that it was anticipated that the loan would be liquidated in the normal operation of the borrower's business, rather than, as in an "investment" context, from a more long-term realization on capital improvements.

4. In the Niles-Bement loan the borrower had the privilege of "prepayment," whereas the GMAC loan agreement referred to the same privilege as one of "redemption," a term more closely associated with traditional debenture financing. And the penalty for "redemption" under the GMAC loan was ¼% for each six months the term of the loan was shortened, whereas in this case the privilege of "prepayment" was "only in the inverse order of the maturity" of the notes, and the ¼% penalty was exacted only if such prepayment was followed by refinancing through another lender during the term of the loan. Moreover, in General Motors, unlike the present case, the agreement required the borrower, at the lender's request, to break up the

large notes into smaller ones, evidently for the purpose of marketability. Compare the presence of such a provision in Gamble-Skogmo, Inc. v. Kelm, D.C.Minn. 1953, 112 F.Supp. 872, and in the Commercial Credit case, supra (which the taxpayers lost), with the absence of such a provision in the Belden and Ely & Walker cases, supra (which the taxpayers won).

5. In General Motors the resolution initiating the borrowing authorized the officers to borrow about $30,000,000 from not more than "ten investors" and required that the lenders state that their "purchases" of the notes were for *investment* account, and not with a view of distribution to the public. Language of purchase and sale was consistently employed in the loan papers. The notes were sold at a negotiated price above par to reflect the interest rate adjustment, just as are traditional bonds and debentures. At least some of the notes were payable to bearer, and the lenders insisted on and received the right at their option to make all the notes fully marketable. Moreover, the lending institutions consisted principally of a group of five insurance companies, and one investment banking house, rather than commercial banks. In short, the GMAC notes had all the characteristics of an issue of marketable corporate securities, and the transaction itself all of the features of what is now known as a "private placement."

In holding that this combination of factors, and others already referred to, put the GMAC notes "in a class apart from ordinary commercial notes and into the category of debentures * * *," our Court stressed the investment nature of the transaction. To be sure, a bank as well as an insurance company in a sense intends to invest when it lends money, whether the transaction be called a loan, a private placement, or a public issue. But the classic feature demanded of an investment instrument is ready marketability, and that is what the GMAC notes had, and what the Niles-Bement notes did not have. And all the cases which have considered the matter appear to have read the General Motors case, as we do, as holding that only those instruments having the characteristics of an investment security fall within the terms of Section 1801. See, e. g., United States v. Ely & Walker Dry Goods Co., supra, 201 F.2d at pages 588–589; Belden Mfg. Co. v. Jarecki, supra, 192 F.2d at pages 213–214; Stuyvesant Town Corp. v. United States, 1953, 111 F.Supp. 243, 247–248, 124 Ct.Cl. 686.

In contrast to what appeared in the General Motors case, the Niles-Bement transaction was initiated along traditional loan lines by application to the Loan Department of the National City Bank, with which Niles-Bement had had ordinary commercial banking relations for twenty years; the interest rate was computed strictly on the face amount of the loan; no language of purchase and sale was used; there was no requirement of a statement of investment intention, nor any provision for breakdown of the notes to promote marketability; and none of the notes were payable to bearer.

We find here no such combination of factors as led the Court in the General Motors case to hold the promissory notes there in question taxable as debentures. We hold that the transaction in this case was a straightforward commercial loan, and that these promissory notes did not partake of the character of debentures.

Fundamentally the issue is a narrow one. Are these instruments "debentures"? We think they are not. Perhaps if we were drafting legislation on the subject we might think it desirable to require that stamps be affixed to documents such as these, or even to all promissory notes over a certain amount. But such matters of policy are for Congress to determine. If commercial bank loans such as we have before us here are to be brought within the ambit of this statute that is a matter for Congress, and not for the Courts, to decide. We do no more than construe the legislation as we find it.

Reversed.

CLARK, Circuit Judge (dissenting).

Judge Harlan's careful and extensive research into the legislative background of the revenue law here involved serves in my judgment to afford strong support for both the reasoning and the decision in General Motors Acceptance Corp. v. Higgins, 2 Cir., 161 F.2d 593, certiorari denied 332 U.S. 810, 68 S.Ct. 112, 92 L.Ed. 388, now largely repudiated in actual result. The narrow distinction of the statute between promissory notes, which are not subject to the stamp tax, and corporate debentures or certificates of indebtedness, which are, is not of our choosing and we have no authority to blot it out or even to soften it. So to do is unjustifiable judicial legislation in my view; and I cannot accept the indictment that the contrary interpretation by Judge Smith and myself is. For the approach of the GMAC decision and of Judge Smith below in a reasoned decision, Niles-Bement-Pond Co. v. Fitzpatrick, D.C.Conn., 112 F.Supp. 132, which I should be glad to accept as my own, is but the appropriate and necessary execution of congressional intent to which we are by law obligated.

The GMAC decision was an outstanding milestone in the interpretation of the statute in several aspects. Perhaps most important was its stress on substance and debunking of form. And among the indicia as to substance which it notes, it does not give exclusive weight to the activity and intent of the *lender*, but rather emphasizes the attitude and need of the *borrower*, thus contrasting a corporation's "capital [obtained] for a substantial period of time from investors for general use in its business just as it might by the sale of its bonds, debentures or similar securities" with "the notes used customarily in day to day commercial transactions of a short time credit character." 161 F.2d at page 595. While Judge Harlan's opinion does not expressly repudiate this holding, yet the present decision and its reasoning surely treads in the opposite direction. Its practical consequence, I suggest, is that bank loans are excepted from the tax, and the statute is amended to that extent—an obvious gain in simplicity, but obtained at the sacrifice of legislative plan for relatively impartial distribution of tax burdens.

The conclusion I have just drawn from the opinion seems to me to follow from the distinctions it finds between this case and the GMAC case, framed in terms of distinctions between commercial loans and corporate debentures. As conceded, some of the features here present operate in favor of the conclusion reached below; these include the restrictions here placed on the borrower, the size of the borrowing, and its very substantial duration. In truth, I do not see anything to override their cumulative impact, any more than did Judge Smith. So the considerations found most significant—those numbered "3" and "5"—seem to me highly illustrative. They come from approaching the problem from the standpoint of the lender, not that of the borrower. Thus the regular intervals of maturity of the notes can mean to the maker only the same kind of amortization now usual in, say, a real estate mortgage. And the differences stressed in the handling of the loans as affects the lenders show convincingly that the real distinction thus isolated is between a "private placement" for such investors as insurance companies and an investment house, in the GMAC case, and a loan by a bank from its own loaning funds. If each suggested difference is actually examined, it becomes apparent that it is entirely for the lender's benefit and convenience in carrying on the business in the form to which it is accustomed. Consider the "classic feature" of "ready marketability," which it is said the present notes did not have. But this is only to say that of course the National City Bank does not make a business of peddling its loans. And can there be doubt that investors would gladly invest in loans made and negotiated to them by that Bank if they were given opportunity?

The point may be underlined by considering the application of this case as

a precedent to future borrowings. A borrower considering how to avoid the additional burden of the stamp tax would see that not his needs or assumed obligations, but rather the source of supply of the funds, would be decisive. Since he can thus easily satisfy his needs in the one fashion as the other, he naturally will go to the lender who has the advantage of also giving him freedom from the burden of the stamp tax. And that is the kind of one-sided advantage to bank loans now read into the act which does seem to me to be deplored.

A recent analysis of this problem, "Stamp Tax on Promissory Notes Representing Term Loans and Private Placements," 54 Col.L.Rev. 428–431 (March, 1954), supporting the GMAC decision and the holding below, seems to me to call attention to criteria which have been overlooked in my brothers' opinion. The writer says (footnotes omitted):

"As of 1924 the 'promissory note' in corporate borrowing evidenced short term commercial loans arising in the ordinary course of business—rather than capital loans—and it is probably from the former that Congress intended to remove the tax. The confusion in the recent cases is apparently due to two significant post-1924 developments in corporate financing practice: the bank 'term loan' and the private placement with institutional investors. All of the GMAC line of cases involved notes representing either term loans or private placements and the courts, usually without recognition that they are dealing with changed methods of corporate finance, have attempted to fit them within the traditional security-promissory note dichotomy." 54 Col.L.Rev. at 429, 430.

Then, after consideration of "private placement" as "a broad term describing all directly negotiated financing between a corporation and an institutional investor, usually an insurance company," and of "term loans" by a bank, which occupy "an anomalous position," being "neither investment nor loan according to traditional banking practice," the author continues:

"With respect to these new forms of corporate finance, it is apparent that the lender's motive in treating the transaction as loan or investment is not a helpful guide in determining taxability. Under this view the borrower is subject to the tax when the lender 'intends to invest.' But since privately placed loans are generally treated as investments and term loans do not fall within either category, if this distinction is pursued it is conceivable that a term loan note negotiated with the loan department of a bank would be nontaxable though an identical note privately placed with an insurance company would be taxed. Similarly, distinctions based on the instrument's marketability do not seem substantial in view of the common provision for converting the note into marketable instruments.

"In light of the meaning of 'promissory note' in 1924 and the subsequent growth of private placement and term loans, the view of the courts following the GMAC case seems the wiser one. The opposing decisions, emphasizing the loan-investment distinction and marketability, run counter to the apparent Congressional intent to leave taxable loans of substantial duration to be used by the borrower for capital purposes. By including within the term 'promissory note' of the 1924 amendment instruments representing the newer methods of corporate finance, these decisions fail to construe these words in light of their meaning at the time of enactment." 54 Col.L.Rev. at 431.

Following this appropriate and clear-cut analysis, I would affirm.