**The CURTIS PUBLISHING COMPANY, a corporation, Plaintiff,**

**v.**

**Francis R. SMITH, Collector of Internal Revenue, Defendant.**

**Civ. A. No. 13422.**

United States District Court,
E. D. Pennsylvania.

Sept. 24, 1954.

Francis H. Scheetz, Philadelphia, Pa., for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Fred J. Neuland, Sp. Assts. to Atty. Gen., W. Wilson White, U. S. Atty., Norman Kron, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

CLARY, District Judge.

This is an action for the refund of documentary stamp taxes assessed by the Commissioner of Internal Revenue and paid by the taxpayer under Section 1800 of the Internal Revenue Code, 26 U.S.C. § 1800. The Commissioner assessed the taxes upon the plaintiff corporation contending that certain promissory notes issued by that corporation were debentures of such a character as to bring them within the reach of Section 1801 of the Internal Revenue Code, 26 U.S.C. § 1801. The facts of the case have been substantially stipulated between the parties and there is no dispute as to the further facts adduced.

Upon pleadings and proof I make the following

Findings of Fact

1. Plaintiff is and at all relevant times has been a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its registered office and principal place of business in Philadelphia, Pennsylvania. Plaintiff is engaged in the business of publishing magazines. (Stipulation, Paragraph 1, R18)

2. Defendant Francis R. Smith was at all relevant times Collector of Internal Revenue for the First Collection District of Pennsylvania. (Paragraphs 1 and 14 of Complaint and Paragraphs 1 and 10 of Answer)

3. Plaintiff desired to obtain additional funds for use in its business. On May 26, 1947, plaintiff's Board of Directors authorized and approved the execution and delivery of a loan agreement with nine banks and authorized certain officers to borrow on behalf of the Company amounts not exceeding $7,200,000 as and when such funds were needed for the purposes of the business. (Stipulation, Paragraph 2, R18)

4. A Loan Agreement, dated June 13, 1947, was entered into between plaintiff and nine banks, namely: Real Estate Trust Company, The Philadelphia National Bank, Tradesmens National Bank and Trust Company, Central-Penn National Bank of Philadelphia, Fidelity-Philadelphia Trust Company, The Pennsylvania Company for Banking and Trusts, The First National Bank of Philadelphia, all of Philadelphia, Pennsylvania, The First National Bank of the City of New York and Central Hanover Bank and Trust Company, both of New York, New York. (Stipulation, Paragraph 3, R18)

5. Under the Loan Agreement the nine banks agreed to lend plaintiff at any time and from time to time until December 31, 1948, sums in specified proportions not exceeding the aggregate principal amount of $7,200,000 at any

one time. The banks' respective commitments were as follows:

| Bank | Amount |
| --- | --- |
| Central Hanover Bank & Trust Co. | $1,000,000. |
| The First National Bank of the City of N. Y. | 1,000,000. |
| The First National Bank of Philadelphia | 950,000. |
| The Pennsylvania Company for Banking & Trusts | 850,000. |
| Fidelity-Philadelphia Trust Company | 850,000. |
| Central-Penn National Bank of Philadelphia | 850,000. |
| Tradesmens National Bank and Trust Company | 800,000. |
| The Philadelphia National Bank | 750,000. |
| Real Estate Trust Company | 150,000. |
| | $7,200,000. |

(Stipulation, Paragraph 4, R18)

6. The Loan Agreement provided that each borrowing should be in the amount of $180,000 or multiples thereof and was to be prorated between the lending banks on the basis of their respective commitments. Each borrowing from each bank was to be evidenced by a negotiable note in the form attached to the Loan Agreement and denoted therein as Exhibit A. (Stipulation, Paragraph 5, R18)

7. The principal amount of each note was to be paid in consecutive quarterly installments beginning March 31, 1949, at the rate of $5/72$ of the principal for each installment during the calendar years 1949 and 1950, and $4/72$ of the principal for each installment during the calendar years 1951 and 1952. Each note was to bear interest at the rate of $2\frac{1}{8}\%$ per annum, payable quarterly at the end of each calendar quarter. (Stipulation, Paragraph 6, R18)

8. The Loan Agreement also included provisions substantially as follows:

(A) In Section II plaintiff made certain representations concerning its financial position as of June 13, 1947, the date of the Loan Agreement. Provision was made for payment of a commitment fee of $\frac{1}{4}$ of $1\%$ per annum on the unused portion of the maximum credit provided for by the Loan Agreement for the period during which any portion of the credit was unused. (Section V)

(B) Plaintiff at any time or from time to time could prepay any or all of the notes at par and accrued interest, provided that (1) prepayments made before December 31, 1948, (the end of the commitment period) could be made only on at least three banking days notice and as to each note were required to be in whole, but not in part payment, (2) prepayments made after December 31, 1948 required at least thirty days prior notice, and as to each note could be in whole or in part, but if in part, in the inverse order of installment maturities, and (3) any prepayment with funds borrowed from others was subject to a premium of $\frac{1}{4}$ of $1\%$ on the amount prepaid from the date of payment to the installment maturity date. (Section III D)

(C) Plaintiff covenanted that until all loans were repaid it would (1) keep and cause its subsidiaries to keep their corporate franchises in full force and effect and comply with all applicable laws, (2) furnish financial statements periodically and such other additional information as the banks might request, (3) keep it and its subsidiaries' properties adequately insured, (4) pay when due all taxes assessed against it or its subsidiaries, except those contested in good faith, (5) maintain the consolidated net working capital of plaintiff and certain subsidiaries at not less than $9,-000,000, and (6) maintain a current asset ratio of not less than one and one-half to one for itself and certain subsidiaries. (Section VII)

(D) Plaintiff also covenanted that until all notes were repaid it and its subsidiaries would not without consent of the banks (1) borrow monies except under the Loan Agreement, (2) mortgage its properties except in specified circumstances, (4) merge, consolidate or dispose of all, or substantially all, of its property, (5) loan money to or invest in

any other business, with certain stated exceptions. (Section VIII)

(E) An acceleration clause under which all notes should become due forthwith upon the occurrence of specified events of default. (Section IX) (Stipulation, Exhibit B, R18)

9. Pursuant to the Loan Agreement plaintiff made three borrowings, namely, one for $1,800,000 on August 15, 1947, one for $1,800,000 on October 15, 1948, and one for $3,600,000 on December 15, 1948, each borrowing being prorated among the nine banks in accordance with their respective commitments. The proportionate amounts of each borrowing loaned by the respective banks were as follows:

| Bank | August 15, 1947 October 15, 1948 | December 15, 1948 |
| --- | --- | --- |
| Central Hanover Bank & Trust Co. | $. 250,000. | $ 500,000. |
| The First National Bank of the City of N. Y. | 250,000. | 500,000. |
| The First National Bank of Philadelphia | 237,500. | 475,000. |
| The Pennsylvania Company for Banking & Trusts | 212,500. | 425,000. |
| Fidelity-Philadelphia Trust Company | 212,500. | 425,000. |
| Central-Penn National Bank of Philadelphia | 212,500. | 425,000. |
| Tradesmens National Bank & Trust Company | 200,000. | 400,000. |
| The Philadelphia National Bank | 187,500. | 375,000. |
| Real Estate Trust Company | 37,500. | 75,000. |
|  | $1,800,000. | $3,600,000. |

(Stipulation, Paragraph 7, R18)

10. On the dates of the several borrowings, plaintiff delivered to each lending bank a note in the form prescribed by the Loan Agreement for the amount borrowed from such bank. The notes were identical except for the name of the promisee, the date, the face amount, the initial interest payment date and the amounts of the repayment installments. The notes were typewritten on ordinary letter size paper and were signed by either the President or the Treasurer, but did not bear plaintiff's corporate seal. They were effective on their execution and delivery without further signature authentication or other formality. (Stipulation, Paragraph 8, R18)

The notes were in the form of ordinary promissory notes and after listing each installment and its maturity date provided:

"This note is one of the Notes described in and is issued pursuant to the terms and conditions of a certain Agreement dated as of June 13, 1947 between the undersigned and certain Banks and Trust Companies to which Agreement reference is hereby made for the rights and obligations affecting the parties."

(Stipulation, Exhibit C, R18)

11. All installments of principal were paid regularly at maturity up to and including the quarterly installment due September 30, 1950, and on October 3, 1950, plaintiff prepaid the entire balances of the loans. Such prepayment was made without premium and from plaintiff's own funds. All interest payments were made as they became due and interest was paid for the period ending October 3, 1950, when the balances of the loans were paid off. All notes were cancelled October 4, 1950 and returned to plaintiff on October 6, 1950. (Stipulation paragraph 9, R18)

512

12. Plaintiff had utilized each of the lending banks, with the exception of Fidelity-Philadelphia Trust Company (which became Trustee under plaintiff's Pension Plan in 1945) and Central-Penn National Bank of Philadelphia, at the times the Loan Agreement and loans thereunder were made, and for many years prior thereto as shown by the following table:

| Bank | Commencement Date |
| --- | --- |
| Central Hanover Bank & Trust Co. | November, 1935 |
| The First National Bank of the City of New York | August, 1939 |
| The First National Bank of Philadelphia | prior to 1923 |
| The Pennsylvania Company for Banking and Trusts | prior to 1923 |
| Fidelity-Philadelphia Trust Company | ———— |
| Central-Penn National Bank of Philadelphia | ———— |
| Tradesmens National Bank & Trust Co. | January, 1930 |
| The Philadelphia National Bank | prior to 1929 |
| Real Estate Trust Company | prior to 1923 |

(Stipulation, Paragraph 10, R18)

13. The loans made to plaintiff pursuant to the Loan Agreement by the nine lending banks were in each case handled by the commercial loan department and officers in the regular course of the bank's commercial banking business and not by its investment department. In each case the procedures followed in handling the loans were the same as those observed generally by the bank with respect to commercial loans and the loans were carried in the bank's loan portfolio. (Stipulation, Paragraph 11, R18)

14. No documentary stamp tax was paid upon execution and delivery of any notes, but after examinations and reports by Internal Revenue Agents documentary stamp taxes were assessed thereon. The assessment on the first two borrowings was $3,960 and this amount was paid by plaintiff to defendant on November 23, 1949, in payment of that assessment. The assessment on the third borrowing was $3,960 and this amount was paid by plaintiff to defendant on August 23, 1950, in payment of that assessment. On December 2, 1949, plaintiff filed a claim for refund of the tax first paid, and the claim for refund was rejected in full on March 23, 1950. On August 17, 1950, plaintiff filed a similar claim for refund of the tax paid in respect of the third borrowing and this was rejected in full on February 14, 1951. (Stipulation, Paragraph 12, R18)

15. Plaintiff filed suit under the Act of June 25, 1948, c. 646, 62 Stat. 932, Title 28 U.S.C. § 1340, for the purpose of obtaining repayment of the documentary stamp taxes paid and the suit was brought within two years of the date of rejection of each of plaintiff's refund claims. (Stipulation, Paragraph 13, R18)

16. In commercial banking practice before an unsecured commercial loan is made, the borrower is usually required to meet certain credit requirements designed to protect the lending bank against credit risks. Generally such requirements are not reduced to writing in the case of short term loans, such as 60 or 90 day loans, but they are nevertheless an integral part of the lending transaction. In general, the same requirements must be satisfied when short term loans are renewed, and the bank by reason of the short maturity is in a position to protect itself against deteriorating credit by insisting on payment or reduction. (R31, 32, 38, 52)

17. In commercial banking practice, loans with maturities of more than one year are known as term loans. In the case of term loans, the lending bank does not have the flexibility in self-protection available in short term loans. It is the practice of commercial banks to incorporate provisions in the note or lending agreement covering term loans substan-

tially the same credit requirements it would have insisted on in considering the granting of a short term loan or its renewal. (R25, 39)

18. Term loans range from $3,000 to the lending bank's legal limit, which in the case of the Pennsylvania Company for Banking and Trusts is approximately $4,000,000. If loans exceed this amount, other banks participate either directly, as in plaintiff's loan, or through the medium of participation certificates issued by the lending bank. (R25–27)

19. It is not usual banking practice to sell term loan notes and the instruments evidencing such obligations are not prepared in a manner to promote marketability. The notes are held by the bank, however, with a view to hypothecating them with the Federal Reserve Bank if additional reserves are required. Such notes could ordinarily not be held by a bank as investments under applicable Pennsylvania banking laws.

20. Plaintiff's notes and loan agreement were typical of term loan transactions negotiated by the Pennsylvania Company for Banking and Trusts and the provisions of the loan agreement were substantially the same as those generally used in such term loan agreements.

### Discussion

The result to be reached in this case, in view of the absence of controversy as to facts, involves primarily a question of law and on a point often litigated but always, nevertheless, difficult of decision. It involves the proper interpretation of that portion of the language of Section 1801 of the Internal Revenue Code, 26 U.S.C. § 1801, which defines, in part, the instruments intended to be taxed thereby. The pertinent language of the statute is as follows:

"* * * all bonds, debentures, or certificate of indebtedness issued by any corporation, and all instruments, however termed, issued by any corporation with interest coupons or in registered form, known generally as corporate securities * * *."

Pursuant to authority delegated by Congress the Secretary of the Treasury has promulgated a regulation implementing the terms of the statute and attempting to define debentures. Treasury Regulations 71 (1941 edition), Section 113.55 provides, inter alia, that

"* * * an instrument, however designated, having all the essential characteristics of a * *. * debenture * * * is taxable as such."

Unfortunately, the wording of the regulation serves only to pose the elements of the problem of definition rather than to solve it.

The Government contends in this action, as it has in other cases more or less factually similar, that the instruments uttered by The Curtis Publishing Company were "debentures" which fall within the sweep of Section 1801. On the contrary, plaintiff in thorough disagreement earnestly contends that they were bona fide "promissory notes" which are not "debentures" and not subject to the stamp tax. The problem, therefore, narrows itself to one of definition of the word "debentures" as Congress has employed it in this Section of the Internal Revenue Code.

It would serve no useful purpose to make an exhaustive comparative analysis of the facts and reasoning of the cases cited by each party to support its respective contentions. The plaintiff relies upon the reasoning and result reached in Niles-Bement-Pond Co. v. Fitzpatrick, D.C., 112 F.Supp. 132, reversed 2 Cir., 1954, 213 F.2d 305; U. S. v. Ely & Walker Dry Goods Co., 8 Cir., 1953, 201 F.2d 584, 36 A.L.R.2d 969; Belden Mfg. Co. v. Jarecki, D.C., 95 F.Supp. 539, affirmed 7 Cir., 1951, 192 F.2d 211; Royal Loan Co. v. U. S., 8 Cir., 1946, 154 F.2d 556, and other cases. Just as strongly to the contrary, the Government contends that General Motors Acceptance Corporation v. Higgins, D.C., 60 F.Supp. 979, reversed 2 Cir., 1947, 161 F.2d 593; Commercial Credit Co. v. Hofferbert, D.C., 93 F.Supp. 562, affirmed per curiam 4 Cir., 1951, 188 F.2d 574 and other cases correctly apply the statute and must

control the result here. The Court of Appeals for the Second Circuit has thoroughly considered the problems arising from the use of the word "debentures" in Section 1801 of the Internal Revenue Code in the G.M.A.C. and Niles-Bement-Pond decisions. In the G.M.A.C. case the court held that the documents there involved were debentures and subject to tax. In the Niles-Bement-Pond case the court held the instruments to be promissory notes and not subject to tax.

The Niles-Bement-Pond and the Curtis loans fairly represent what is apparently an increasingly common corporate credit device. It is, of course, of the utmost importance to both the Treasury Department and the taxpayer that the tax consequences of such a transaction be reasonably predictable. In my opinion the Second Circuit has laid down in a difficult aspect of tax law a workable and legally proper standard which is worthy of preservation and respect. It is the Government's contention that credit instruments such as are here involved were intended to be taxed by Congress, but I cannot discover such intention in the wording of the statute and regulations. The facts in this case indicate a straightforward commercial loan rather than a debenture issue as that term is commonly understood in banking circles. Congress has before at various times in the history of our nation imposed stamp taxes on instruments of the type here involved. However, the last such enactment was repealed in 1924 and has never been reenacted in any form. It would appear, therefore, that had the Congress intended to subject ordinary promissory notes to stamp taxes, it would have used the clearer and more precise terminology of the earlier statutes.

My view of the instant fact situation is that for the purpose of decision the case is identical with the Niles-Bement-Pond case. In only two respects do the facts differ. The term of the Niles-Bement-Pond loan was longer than that granted to this plaintiff, seven years as against something over three years.

The amount of the Curtis loan was the larger of the two—$7,200,000 as against $3,125,000. I do not think that either factual situation is of sufficient significance to require a different result. I adopt the reasoning and the result reached in the opinion of Circuit Judge Harlan in the Niles-Bement-Pond case.

### Conclusions of Law

1. The Court has jurisdiction over the parties to the action and the subject matter thereof.

2. The twenty-seven instruments delivered by plaintiff to the nine lending banks, on which stamp taxes were assessed and paid, were promissory notes and were not debentures or other type of instrument within the meaning of, and subject to tax under, Section 1801 of the Internal Revenue Code.

3. Stamp taxes on said twenty-seven instruments were illegally assessed and collected by defendant Collector of Internal Revenue.

4. Plaintiff is entitled to judgment against defendant in the sum of $7,920 together with interest and costs as prescribed by law.